# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-02748-PAB-KAS

MERCER GLOBAL ADVISORS, INC.,

        Plaintiff-Counterclaim Defendant,

v.

ACG WEALTH, INC. a Georgia corporation,
JEFFREY SHAVER, an individual,
JOSEPH YOUNG, an individual,
DAVID MILLICAN, an individual,

        Defendants-Counterclaim Plaintiffs.

---

**FIRST AMENDED COMPLAINT**

---

Plaintiff Mercer Global Advisors Inc. ("Mercer") hereby submits its First Amended Complaint against defendants ACG Wealth, Inc. ("ACG Wealth"), Jeffrey Shaver ("Shaver"), Joseph Young ("Young"), and David Millican ("Millican") (collectively, "Defendants"), alleging as follows:

**<u>PARTIES</u>**

1. Mercer is a Delaware corporation registered to do business in Colorado with its principal place of business at 1200 17th Street, Denver, Colorado 80202.

2. ACG Wealth is a Georgia corporation with its principal place of business at 2370 Elder Mill Road, Watkinsville, GA, 30677.

3. Jeffrey Shaver is an individual residing in the state of Georgia.

4. Joseph Young is an individual residing in the state of Georgia.

5.      David Millican is an individual residing in the state of Georgia.

## JURISDICTION AND VENUE

6.      This Court has personal jurisdiction over each of the Defendants because the Defendants purposefully availed themselves of this forum by entering into the transactions described herein.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because all Plaintiffs are citizens of a different state than all Defendants, and complete diversity of citizenship therefore exists, and the amount in controversy both collectively and as to each of the claims pled below is at least $75,000.

8.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(a) because this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

9.      In addition, this Court has personal jurisdiction over each of the Defendants and venue in this District is proper because the Parties expressly agreed, in Section 9.16 of the Asset Purchase Agreement (the "APA"), in pertinent part:

> THE PARTIES CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS LOCATED WITHIN THE STATE OF COLORADO, DENVER COUNTY.  EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BYLAW, ANY CLAIM THAT (I) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURTS, (II) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS USED BY SUCH COURTS OR (III) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM.

///

///

- 2 -

**GENERAL ALLEGATIONS**

10.     Mercer provides financial planning, investment management, and other financial services to individuals, businesses, and employers across the United States.

11.     Until 2021, ACG Wealth provided financial advice to individuals, businesses, and employers primarily located in Georgia.  Shaver, Young, and Millican, collectively, were the owners of ACG Wealth.

12.     On August 6, 2021, Mercer entered into a written APA with Defendants pursuant to which Mercer agreed to purchase all of the assets, business, and operations of ACG Wealth, except for a limited list of "Excluded Assets."  Attached hereto as **Exhibit A** is a true and correct redacted copy of the relevant excerpts of the APA.[1]  At the time Mercer entered into the APA, Mercer believed, based upon the representations of Defendants, that Mercer was purchasing a robust, successful, well-run wealth advisory business, and that Young and Shaver were active advisors who would bring over a committed team.  What Mercer later learned, however, was that this was all a fiction.  Contrary to the picture that Defendants had been painting, Young and Shaver had been disengaged from their business for years and had barely, if any, contact with some of the key ACG Wealth advisors that they purported to manage.  Young and Shaver did not prepare their employees for the acquisition and did virtually nothing to facilitate their transition from ACG Wealth to Mercer Advisors.  Indeed, Young and Shaver did not even inform key high-producing advisors from ACG Wealth's staff of the impending transaction until virtually the eve of closing.  As set forth in more detail throughout this Complaint, Defendants' extremely hands-off approach continued and even worsened throughout ACG Wealth's year-long

---

[1] The attached copy of the APA has been redacted to protect certain highly confidential financial information.

integration, ultimately leaving Mercer with a materially underperforming acquisition.

13.     In the months immediately following the acquisition, Young and Shaver essentially stopped working; for example, they did not check or respond to messages on their Mercer email accounts or sign on to the Company's other computer systems with any regularity, did not attend required transition, team and training meetings, did not engage with and/or respond to requests for information from Company executives, and did not bring in new clients and/or recruit new advisors to Mercer, all of which was required of Defendants under their respective Employment Agreements.  This flagrant failure to perform the job duties outlined in their Employment Agreements caused Mercer to terminate Defendants' employment for cause.  Further, Defendants' utter lack of attention and effort in transaction and post-transaction periods resulted in Defendants' failure to earn the full Earn Out Payment they were eligible (but not entitled) to receive under the APA.

14.     During this time, Mercer also learned of numerous material omissions and/or misrepresentations that Defendants made during the acquisition process that contradicted the representations and warranties set forth in the APA.  Moreover, since the filing of this lawsuit, Defendants have continued their pattern of breaches by repeatedly disclosing confidential terms in violation of the APA's express confidentiality obligations.  Due to these multiple breaches of the APA, the available Earn Out Payment amount was further offset by the significant costs that Mercer incurred from addressing and correcting the issues that Defendants concealed from Mercer during the acquisition process.

**The APA**

15.     Before Defendants' myriad of misrepresentations and management issues became apparent, Mercer agreed to pay Defendants a substantial "Purchase Price" for the assets of ACG

- 4 -

Wealth.  The Purchase Price consisted of two primary elements: (1) an initial closing payment; and (2) a subsequent "Earn-Out Payment."  *See* APA § 2.1.

16.     The amount of the Earn-Out Payment was to be calculated and paid following the "First Anniversary Date," the date occurring one year after the APA's Closing.  *Id.* p. 41.  The Earn-Out Payment would be calculated according to one of three possible formulas, dependent upon what percentage of a target revenue figure, "Performance Target Revenue," the actual "First Anniversary Date Revenue" reached between closing and the First Anniversary Date.  *Id.* § 2.7.  A critical premise of the earnout is that it is the selling party's responsibility to ensure revenues are retained—*including* ensuring that key advisors join Mercer following the acquisition.

17.     The Earn-Out Payment was also subject to reduction under certain circumstances set forth in the APA.  *See* APA § 2.7(c) ("Buyer shall have the right at its sole option to withhold and set off against any amount otherwise due to be paid pursuant to Section 2.7 the amount of any Losses then payable to a Buyer Indemnified Party under Article VII.").  Article VII, in turn, articulated Mercer's right to indemnification for all "Losses," as that term is defined in the APA, resulting from a series of specified categories of items, including but not limited to "(a) any inaccuracy in or breach of a representation or warranty made herein by a Selling Party"; and "(b) any non-compliance with or breach by a Selling Party of any of the covenants or agreements contained in the APA to be performed by Selling Parties or any of their Affiliates."  *Id.* § 7.1.  Thus, Mercer was entitled to "set off" or reduce the amount of any Earn-Out Payment to account for, among other things, any breach of any representation or warranty made by Sellers in the APA, and to any breach of any covenant or agreement in the APA.

- 5 -

18.    The representations and warranties for which Mercer was entitled to indemnity under Section 7.1 — and, therefore, to set off and reduction of the Earn-Out Payment — were specified in Section 2.8 of the APA.  These representations included the warranty in Section 3.9(b) of the APA which stated, in pertinent part, "the Selling Parties do not have any obligations or liabilities (whether accrued, absolute, contingent, unliquidated or otherwise, whether or not known to Selling Parties…)."  *Id.* § 3.9(b).  In addition, pursuant to Section 3.12(f), Defendants made certain representations about ACG Wealth's status as a registered investment company and, pursuant to Section 3.13(d), that except as specifically disclosed in Schedule 3.13(d) of the APA, ACG Wealth was in compliance with a series of identified matters.  *Id.* § 3.13(d).

19.    Critical to Mercer's willingness to enter into the transaction was the successful transition of key advisers, including one particular advisor, "KJ," to join Mercer following the transaction's closing.  Accordingly, Mercer insisted, as part of the APA, on including an express provision, Section 5.3(a), obligating Defendants to each use commercially reasonable efforts to assist Mercer in hiring and retaining the services of ACG Wealth's other employees.  Without that commitment, Mercer would not have entered into the APA.

20.    Also material to Mercer's willingness to enter into the APA transaction were certain specifically enumerated safeguards and confidentiality provisions to protect Mercer from the public disclosure of sensitive business information and to prevent the harm that would result from such disclosure.  More specifically, Section 5.5(e) of the APA provides:

> From the date hereof and thereafter, Selling Parties shall keep secret and retain in strictest confidence, and shall not, without the prior written consent of Buyer, furnish, make available or disclose to any third party or use for the benefit of itself or any third party, any Confidential Information. As used in this Section 5.5(e), "**Confidential Information**" shall mean any information relating to (i) this Agreement or the Transaction Documents or the transactions contemplated hereby or thereby or (ii) the Business and the business or affairs of Buyer, including

information relating to financial statements, client or customer identities, potential clients or customers, employees, suppliers, servicing methods, equipment, programs, strategies and information, analyses, profit margins or other proprietary information; provided, however, that Confidential Information shall not include any information which is in the public domain or becomes generally known in the public domain through no wrongful act on the part of Selling Parties. Selling Parties acknowledge that the Confidential Information is vital, sensitive, confidential and proprietary to the Business.

21.     Further, Section 9.2 of the APA provides in pertinent part:

No Selling Party shall make any public announcement or filing with respect to the transactions provided for herein without the prior consent of Buyer (subject, for avoidance of doubt, to the delivery by Seller to each of its clients of written notice of the transaction in accordance with Section 5.1(b) and the other applicable provisions of this Agreement).

22.     The APA was amended once prior to closing, on October 31, 2021, through entry into a written Amendment to Asset Purchase Agreement (the "Amendment").  A copy of the Amendment is attached hereto as **Exhibit B**.[2]  The Amendment, among other things, slightly increased the base purchase price and added an opportunity to earn an additional earnout, which was, like the Earn-Out Payment set forth in the original APA, subject to express rights of set-off by Mercer.

**The Employment Agreements**

23.     The APA also required Young and Shaver to enter into new written employment agreements and become employees of Mercer following closing.  Young and Shaver's retention as post-closing employees was critical to the ability of Mercer to successfully transition ACG Wealth's client base and business to Mercer and, accordingly, Mercer would not have entered into the transaction without Young and Shaver's continuing commitment.

---

[2] The attached copy of the Amendment has, like the APA, been redacted to protect certain highly confidential financial information.

24.    Consistent with this desire by Mercer, on October 31, 2021, Young and Shaver both entered into substantially identical written Employment Agreements with Mercer (the "Employment Agreements").  True and correct redacted copies of the relevant excerpts of the Employment Agreements are attached hereto as **Exhibits C and D**, respectively.  Under the terms of the Employment Agreements, Shaver and Young were each retained to serve as Vice Presidents of Business Development and Senior Wealth Advisors with a substantial base salary, plus the potential for additional incentive and commission-based compensation.

25.    Under Section 1.3 of the Employment Agreements, Young and Shaver were each to be employed by Mercer for a two-year term, terminable by Mercer for "Cause."  "Cause" was defined in Sections 1.3.3 and 1.3.3.1 of the Employment Agreements, and included "(iv) substantial and repeated failure to perform duties as reasonably directed by the CEO or an officer of Employer to whom Employee reports": "(v) gross negligence or willful misconduct with respect to Employer or any of its affiliates"; "(vi) substantial under-performance in carrying out Employee's duties under this Agreement as determined by the CEO in good faith or an officer of Employer to whom Employee reports"; and "(vii) material breach[es] of a covenant or material misrepresentation by Employee under this Agreement."

**The Transaction Closes and Controversies Arise**

26.    The transaction closed on October 31, 2021, with Mercer delivering the payments required at closing and otherwise performing all of its obligations under the APA and the Employment Agreements.  Defendants, however, have not done the same.  Instead, rather than actively carrying out their post-closing roles as Vice Presidents of Business Development and Senior Wealth Advisors, Young and Shaver collected their paychecks and apparently called it a

- 8 -

day.  Their post-closing conduct makes clear that neither had any intention of fulfilling even the most basic of obligations owed under their Employment Agreements or the APA.

27.     Indeed, despite their express obligations under Section 5.3(a) of the APA, neither Defendant timely informed the key advisors who comprised the majority of ACG Wealth's assets under management ("AUM"), and therefore its value, including KJ, that the transaction was under consideration.  Young and Shaver did not satisfy their obligations under Section 5.3(a) of the APA to take commercially reasonable steps to ensure the retention of key personnel and otherwise failed to take the actions described in more detail above and numerous others, instead apparently taking the money from the sale and heading to the golf course.  After the transaction closed, neither Defendant attended any meetings with ACG Wealth's advisors, nor did they engage in a range of other critical activities that would have facilitated the retention of advisors or that were otherwise part of their job duties.  As a result of these failures, key ACG Wealth advisors, comprising a significant portion of its AUM, departed from Mercer soon after closing.

28.     On March 31, 2023, Mercer sent Young and Shaver each written notices (the "Termination Notices") terminating their employment with Mercer for Cause, pursuant to Section 1.3.3 and 1.3.3.1 of the Employment Agreements.  True and correct copies of the Termination Notices are attached hereto as **Exhibits E and F**, respectively.

29.     Further, Mercer has since learned that, contrary to the representations and warranties set forth in the APA, including Section 3.9(b), 3.12(f), and 3.13(d), Defendants had certain undisclosed liabilities for which Mercer is entitled to indemnification under Sections 7.1(a) and (d) of the APA.  Accordingly, on April 13, 2023, Mercer sent Defendants a written notice of claim (the "April 2023 Letter"), demanding indemnification for the associated losses and informing Defendants that Mercer was exercising its right of set off pursuant to Sections

- 9 -

2.7(c) and 2.8(c) of the APA, resulting in a reduced final net Earn-Out Payment.  Concurrently with the April 2023 Letter, Mercer provided Defendants with a written calculation of the Earn-Out Payment (the "Mercer Calculation").

30.     Over the following months, Mercer engaged in extensive correspondence and communications with counsel for Defendants regarding both the termination of their employment and the correct amount of the Earn-Out Payment.  These include, among others, a July 14, 2023 letter from Mercer's counsel setting forth further explanation of the cause for Young and Shaver's termination.  A true and correct copy of the July 14, 2023 letter is attached hereto as **Exhibit G.**

31.     Defendants have not meaningfully refuted Mercer's specific allegations of their underperformance, nor have they made any legitimate efforts to explain their utter lack of effort and participation in the integration process.  Incredibly, Defendants have instead responded by asserting, *inter alia*, that: (i) Mercer was not entitled to terminate Young and Shaver's employment for "Cause"; (ii) that the base amount of the Earn-Out Payment, as calculated by Mercer is incorrect and, to the contrary, Defendants are entitled to the full maximum Earn-Out Payment despite making no meaningful effort prior to or after the closing of their sale of the business to *earn* such Earn-Out Payment; (iii) that Mercer is not entitled to any set off or reduction of the Earn-Out Payment; (iv) that Mercer is not entitled to indemnification for the matters set forth in the April 2023 Letter; and (v) that Mercer is not entitled to exercise any right of set off against the Earn-Out Payment for the issues set forth in Mercer's April 2023 Letter.

32.     Defendants have continued to breach the APA even after the initiation of the instant lawsuit.  Notwithstanding their express confidentiality commitments in the APA, since the filing of this action, Defendants have on multiple occasions publicly disclosed material

- 10 -

nonpublic terms of the APA which has damaged Mercer, including sensitive data that could be used by Mercer competitors and other business transaction partners to obtain an unfair competitive advantage in subsequent transactions.

## FIRST CLAIM FOR RELIEF

### (Mercer Against All Defendants for Breach of the APA)

33. Mercer incorporates the preceding allegations as if set forth herein.

34. Mercer and Defendants entered into a valid written contract, the APA.

35. Mercer timely performed its obligations under the APA, delivering the closing payment when due and payable.

36. Defendants were obligated, under Section 5.3(a) of the APA, to employ commercially reasonable efforts to ensure the retention of ACG Wealth's advisors and employees.

37. Defendants were also obligated, under Section 5.5(e) of the APA, to "keep secret and retain in strictest confidence, and shall not, without the prior written consent of Buyer, furnish, make available or disclose to any third party or use for the benefit of itself or any third party, any Confidential Information[,]" which includes, among other things, "any information relating to [] this Agreement or the Transaction Documents or the transactions contemplated hereby or thereby[.]"

38. Moreover, Defendants were obligated, under Section 9.2 of the APA, to seek "prior consent" from Mercer before "mak[ing] any public announcement or filing with respect to the transactions provided for" in the APA.

- 11 -

39.     Defendants breached their obligations under the APA by failing to employ commercially reasonable efforts to ensure the retention of ACG Wealth's advisors and employees.

40.     Since the filing of this lawsuit, Defendants have breached the APA by disclosing on multiple occasions confidential and sensitive provisions of the APA, in violation of the express commitments set forth in Sections 5.5(e) and 9.2 of the APA.

41.     Mercer has been damaged by Defendants' breaches in an amount to be proven at trial in this matter.

42.     Mercer seeks damages in an amount to be proven at trial, as well as injunctive relief to prevent Defendants from further violating Sections 5.5(e) and 9.2 of the APA.

## SECOND CLAIM FOR RELIEF

### (Mercer Against All Defendants for Declaratory Judgment Regarding the APA)

43.     Mercer incorporates the preceding allegations as if set forth herein.

44.     An actual and present controversy has arisen between the parties with respect to: (1) the accuracy of Mercer's calculation of the Earn-Out Payment owed and payable to Defendants under the APA; and (2) whether Mercer is entitled to set off and reduce the amount of any otherwise payable Earn-Out Payment pursuant to the rights of set off set forth in Sections 2.7(c) and 2.8(c) of the APA.

45.     Mercer is entitled to a declaratory judgment that: (1) Mercer's calculation of the Earn-Out Payment owed and payable to Defendants under the APA is correct and adequately represents the total Earn-Out Payment due to Defendants; and (2) Mercer is entitled to set off and reduce any otherwise payable Earn-Out Payment pursuant to the rights of set off set forth in Sections 2.7(c) and 2.8(c) of the APA.

**THIRD CLAIM FOR RELIEF**

**(Mercer Against Young for Declaratory Judgment Under Young's Employment Agreement)**

46.     Mercer incorporates the preceding allegations as if set forth herein.

47.     An actual and present controversy has arisen between the parties with respect to whether Mercer was entitled to terminate Young's employment with Mercer for "Cause" under the terms of Young's Employment Agreement.

48.     Mercer is entitled to a declaratory judgment that Mercer was entitled to terminate Young's employment with Mercer for "cause" under the terms of Young's Employment Agreement.

**FOURTH CLAIM FOR RELIEF**

**(Mercer Against Shaver for Declaratory Judgment Under Shaver's Employment Agreement)**

49.     Mercer incorporates the preceding allegations as if set forth herein.

50.     An actual and present controversy has arisen between the parties with respect to whether Mercer was entitled to terminate Shaver's employment with Mercer for "Cause" under the terms of Shaver's Employment Agreement.

51.     Mercer is entitled to a declaratory judgment that Mercer was entitled to terminate Shaver's employment with Mercer for "cause" under the terms of Shaver's Employment Agreement.

WHEREFORE, Mercer respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

a.      Declaring that the Mercer Calculation is accurate and represents the total Earn-Out Payment payable to Defendants under the APA and/or the Amendment;

- 13 -

b.      Declaring that Mercer is entitled to set off and reduce the amount of any

otherwise payable Earn-Out Payment for amounts arising from the matters set forth in the April

2023 Letter under the APA and/or the Amendment;

c.      Declaring that Mercer was entitled to terminate Young's employment for "Cause"

under the terms of Young's Employment Agreement;

d.      Declaring that Mercer was entitled to terminate Shaver's employment for "Cause"

under the terms of Shaver's Employment Agreement;

e.      Providing Mercer injunctive relief to prevent Defendants from further violating

Sections 5.5(e) and 9.2 of the APA;

f.      Awarding Mercer its damages in an amount according to proof;

g.      Awarding attorneys' fees to the extent permitted under contract or law;

h.      Awarding Mercer its costs incurred in pursuing this action; and

i.      Awarding such other relief that the Court deems necessary and appropriate under

the circumstances.


Dated: January 31, 2024              By:  */s/ William P. Donovan, Jr.*
                                          William P. Donovan, Jr.
                                          Jason D. Strabo
                                          Preny Sarkissian
                                          McDERMOTT WILL & EMERY LLP
                                          2049 Century Park East, Suite 3200
                                          Los Angeles, CA 90067
                                          Phone:  (310) 277-4110
                                          Facsimile:  (310) 277-4730
                                          E-mail:  wdonovan@mwe.com
                                                   jstrabo@mwe.com
                                                   psarkissian@mwe.com
                                          *Attorneys for Plaintiff-Counterclaim Defendant,*
                                          *Mercer Global Advisors Inc.*


- 14 -